WHEELWRIGHT, Respondent, vs. PURE MILK ASSOCIATION, Appellant. [Three cases.]
SKALITZKY, Respondent, vs. PURE MILK ASSOCIATION, Appellant. [Three cases.]
BIEDERMAN, Respondent, vs. PURE MILK ASSOCIATION, Appellant. [Three cases.]
PEARSALL, Respondent, vs. PURE MILK ASSOCIATION, Appellant. [Three cases.]

*November 12, 1931—May 10, 1932.*

For the appellant there were briefs by *Richmond, Jackman, Wilkie & Toebaas* of Madison, attorneys, and *Jenkins & Kirkpatrick* and *Martin Burns* of Chicago of counsel, and oral argument by *Mr. Harold M. Wilkie* and *Mr. Burns*.

For the respondents there were briefs by *Gilbert, Ela, Heilman & Raeder,* and oral argument by *Emerson Ela* and *G. Burgess Ela,* all of Madison.

The following opinions were filed February 9, 1932:

WICKHEM, J. The plaintiffs and the claimants, whom they represent by assignment, are producers of milk in the vicinity of Marshall, Wisconsin. The defendant is a co-operative association organized under the laws of the state of Illinois, having a membership of about 20,000 producers, of which about 5,000 are within the state of Wisconsin. Each of the claimants and plaintiffs signed an agreement with the defendant, whereby each of the plaintiffs and claimants agreed to deliver to the association all milk produced by him for market, at such plant, platform or loading station, and in such form, as should be mutually agreed upon by the association and the member.

Paragraph four of the contract provides:

"The member hereby constitutes the association his sole and exclusive agent for the purpose of handling or marketing such milk, together with milk delivered by other members signing similar agreements, and the association hereby agrees to market the milk in such a way as it shall deem best for the advantage of all persons signing similar agreements."

These contracts were signed during the year 1929, and in accordance therewith claimants, during 1930, delivered their milk at the plant of the Bowman Dairy Company, at Marshall, and received Chicago fluid-milk prices for it. The Bowman Company had agreed with the defendant association to take this milk and to pay for it upon a fluid-milk basis during the year 1930. It should be stated at this point that the price of fluid milk is higher than that of milk sold for other purposes, such as manufacturing. It appears that the Bowman Company was buying at fluid-milk prices more milk than it could sell in the fluid-milk market, and this ex-

cess was greater in its case than that of any other dealer who was buying from members of the association. The Bowman Company, in the latter part of November, 1930, gave notice to claimants that after December 1, 1930, it could not purchase their milk on the fluid-milk basis. This notice was also given to the general manager of the defendant association. The complaint alleges that the breach by the defendant association consists of a failure to market the milk of the claimants as fluid milk for consumption within the city of Chicago. As a result, the plaintiffs have been out of the Chicago fluid-milk market. The contention of the plaintiffs, briefly, is that the contract obligated the defendant association to market plaintiffs' milk on the Chicago fluid-milk market together with and upon the same basis as the milk of other members of the association.

The evidence is voluminous, but the principal legal questions presented fall within a very narrow compass. They relate principally to the interpretation of the contract and to the propriety of resorting to parol evidence for this purpose.

The first question is indicated by the contentions of the parties. Plaintiffs claim that the contract clearly and unambiguously obligates the defendant to handle and market plaintiffs' milk, *together with the milk of other members signing similar agreements,* in such a way as it shall deem best *for the advantage of all persons signing similar agreements*. The portions of the agreement italicised indicate the emphasis insisted upon by the plaintiffs. Plaintiffs contend that the contract is plain and unambiguous in so far as it obligates the association to market plaintiffs' milk, together with the milk of other members, and that it is equally plain and unambiguous in its requirement that all procedures taken by the defendant must be for the advantage of all persons signing similar agreements. Plaintiffs concede that any pro-

cedure taken by the association for the benefit of all of its members may be justifiable under the contract if it is not arbitrary or capricious. But they contend that there is no basis for a construction that will permit the association, even in good faith or for good reasons, to adopt or consent to a procedure which will leave some of the members out of the market and some of them in. The defendant argues that the contract is clear and unambiguous and merely obligates the association to take such measures as it shall deem best in marketing the milk, and that any evidence that falls short of showing an abuse of discretion or arbitrary or capricious conduct discriminatory against these plaintiffs is insufficient to make a case against the defendant. The defendant further argues that, assuming that the contract does not clearly mean what it claims it to mean, it is at least ambiguous and open to interpretation by parol evidence. Most of the errors assigned by defendant with respect to this question relate to the refusal of the trial court to admit such evidence.

The rule in Wisconsin with respect to the admissibility of parol evidence for the purposes of interpretation has been set forth in numerous cases. If the contract is ambiguous, evidence of the surrounding circumstances, practical construction by the parties, and even the declarations of the parties constituting the negotiations may be resorted to in aid of construction. *Firestone Tire & Rubber Co. v. Werner,* 204 Wis. 306, 236 N. W. 118, and cases cited.

If the contract is clear and unambiguous such evidence must be excluded. *John O'Brien L. Co. v. Wilkinson,* 117 Wis. 468, 94 N. W. 337; *Schuhknecht v. Robers,* 192 Wis. 275, 212 N. W. 657. In *Zohrlaut v. Mengelberg,* 144 Wis. 564, 124 N. W. 247, 252, 128 N. W. 975, the court said:

"In answer to the contention of counsel that testimony of the circumstances surrounding and leading up to the making of a written contract are always admissible for the pur-

pose of putting the court in the position of the parties at the time the contract was made, this court has said: 'Not so! Where there is no ambiguity in the contract, either in its literal sense, or when it is applied to the subject thereof, it must speak for itself, entirely unaided by extrinsic matters. Where such ambiguity does exist, then evidence of the circumstances under which the contract was made is proper to enable the court, in the light thereof, to read the instrument in the sense the parties intended, if that can be done without violence to the rules of language or of law.' *Johnson v. Pugh,* 110 Wis. 167, 170, 85 N. W. 641. Parties cannot use terms with a fixed and certain meaning and then disclaim such meaning."

In commenting upon the rule and cases holding as does the *Zohrlaut Case,* Mr. Williston states:

"In regard to some of these statements, it may be guessed that the court, in denying the admissibility of evidence of surrounding circumstances to vary the meaning of an apparently clear writing, meant no more than that in the particular case the evidence offered would not persuade any reasonable man that the writing meant anything other than the normal meaning of its words would indicate and that therefore it was useless to hear the evidence." 2 Williston, Contracts, p. 1216.

He states the correct principle to be well summarized in *Eustis Mining Co. v. Beer, Sondheimer & Co. Inc.* 239 Fed. 976, in which the court said:

"All the attendant facts constituting the setting of a contract are admissible, so long as they are helpful; the extent of their assistance depends upon the different meanings which the language itself will let in. Hence we may say, truly perhaps, that, if the language is not ambiguous, no evidence is admissible, meaning no more than that it could not control the sense, if we did let it in; indeed, it might 'contradict' the contract—that is, the actual words should be remembered to have a higher probative value, when explicit, than can safely be drawn by inference from surroundings. Yet, as all language will bear some different meanings, some

evidence is always admissible; the line of exclusion depends on how far the words will stretch, and how alien is the intent they are asked to include."

"Whatever may be the propriety of admitting evidence of extrinsic facts where the meaning of the instrument is apparently clear, there is no question that such evidence is admissible in every jurisdiction where there is no clear apparent meaning. It must be kept in mind, however, that the only purpose for which such evidence is ever admissible in an action on the contract, is to interpret the writing. So far as the evidence tends to show not the meaning of the writing but an intention wholly unexpressed in the writing, it is irrelevant." 2 Williston, Contracts, p. 1217.

It is probably accurate to say that the language of a contract is ambiguous, within the meaning of these authorities, when it may reasonably be taken in more than one sense. In other words, the language must have some stretch in order to authorize the admission of parol evidence without violating the rule against contradicting a writing by parol. For the same reason the parol evidence must establish a sense or meaning which the language of the contract will reasonably bear. In *Farmers' L. & T. Co. v. Commercial Bank,* 15 Wis. *424, the court said:

"But it must be borne in mind that it is not the business of construction to look outside of the instrument to get at the intention of the parties, and then carry out that intention whether the instrument contains language sufficient to express it or not; but the sole duty of construction is, to find out what was meant by the language of the instrument. And this language must be sufficient, when looked at in the light of such facts as this court is entitled to consider, to sustain whatever effect is given to the instrument."

Applied to the first question the inquiry is: First, Is the contract ambiguous in that it may reasonably be taken in more than one sense; second, Is the language of the contract capable of expressing the intention which defendant claims is disclosed by the parol evidence which is offered? It is de-

fendant's contention that this contract expressly constitutes the association a selling agent, and that the term "agent" refers to a person having well defined and well understood responsibilities to his principal; that an agent for sale, without an express contract to that effect, does not agree to do more than to exercise good faith and his best efforts to sell. Hence, it is contended that its agreement to sell, *together with the milk of other producers,* is subject to the same qualifications that attach generally to the promise of an agent for sale. It undertakes to sell the principal's milk if, by the exercise of diligence and good faith, it can do so. It engages to sell the milk, together with that of other members of the association, if, after exercising this degree of diligence and effort, it can do so. It engages to market the milk to the advantage of all persons signing similar agreements—with the same qualification—if it can do so by the exercise of good faith and proper diligence. On the other hand, the plaintiffs contend with equal earnestness that the express undertaking to market the milk in such a way as defendant shall deem best for the advantage of all persons signing similar agreements, and the designation of the defendant as an agent to handle the milk of plaintiffs together with that of other members, taken in connection with such evidence as the contract furnishes that this is a co-operative contract, clearly indicates an obligation to market all milk together and for the advantage of all.

We have come to the conclusion that the provisions of the contract are ambiguous; that it has not a single clear meaning, and that its language will reasonably accommodate itself to either of the meanings contended for. The mere statement of the ably presented arguments addressed to showing that the contract clearly and unambiguously imposes two different and inconsistent obligations is in itself quite persuasive of the fact that the language is reasonably susceptible of either meaning. As we view it, the ambiguity arises

principally from the association of the word "agent" with the phrase "market the milk in such a way as it shall deem best for the advantage of all persons signing similar agreements." The sense in which the words "agent" and "market" are used, the sense in which the phrase requiring the milk to be marketed together and for the benefit of all is to be understood, and the significance of the proviso "as it shall deem best," seem to us doubtful. Under these circumstances it is our conclusion that either party is entitled, under the rule as heretofore stated, to introduce parol evidence for the purpose of interpretation.

It is not considered necessary to set forth in detail the evidence offered by defendant which is properly admissible under this ruling, or to rule upon the propriety of admitting or excluding each item of evidence offered. The evidence was all excluded because the court thought the contract unambiguous in this respect, and there is no serious question as to the sort of parol evidence which is properly admissible in such a situation.

The second question is whether, by reason of the fact that the contract does not disclose the market in which it was contemplated the milk was to be sold, the plaintiffs may disclose by parol evidence the fact that disposition of the milk in the Chicago fluid-milk market was the subject of the contract.

We have concluded that such evidence was also admissible. It probably does not matter greatly whether this be treated as a latent ambiguity, or whether the parol evidence comes in for the purpose of identifying the subject matter of the contract and applying the contract to this subject matter. It appears that there are several forms in which milk may be marketed, and several types of market. Parol evidence tending to show where the milk was to be marketed, or the form in which it was to be sold, would therefore not come into

competition or be inconsistent with or tend to contradict or vary the obligation to market. Hence, parol evidence could properly be adduced for this purpose.

The defendant contends that the court erred in its instruction with respect to question number one, in leaving to the jury the question whether the contract was sufficiently ambiguous to permit consideration of plaintiffs' evidence tending to show that the negotiations had to do with the Chicago fluid-milk market.

In 2 Williston, Contracts, sec. 616, the rule is stated to be:

"The general rule is that construction of a writing is for the court. Where, however, the meaning of a writing is uncertain or ambiguous, and parol evidence is introduced in aid of its interpretation, the question of its meaning should be left to the jury."

In *Vilas v. Bundy,* 106 Wis. 168, 81 N. W. 812, it is held that the question whether there is an ambiguity is for the court to determine, but where there is an ambiguity and resort to extrinsic evidence is necessary and proper, it is for the jury, under proper instructions, to say what the parties in fact agreed to, unless the extrinsic evidence is not in conflict or unless no conflicting inferences may reasonably be drawn, in which case it is for the court to construe the contract.

In this case the court erroneously submitted to the jury by his instructions the duty of ascertaining whether the contract was ambiguous or not. If it was ambiguous they were instructed to consider all of plaintiffs' evidence tending to show whether the parties contracted for the Chicago fluid-milk market. In view of the fact that the case is to be retried, and in view of the fact that we hold plaintiffs' evidence to be admissible, it is not necessary to do more than to call attention to the error, which, from the whole record, appears to have been a mere inadvertency.

Defendant contends that the measure of damages, as set forth in the instructions, is incorrect and that the court erroneously admitted evidence offered by plaintiffs and excluded evidence offered by defendant, addressed to this issue. This requires some consideration of the proper measure of damages, assuming plaintiffs' contention with respect to the contract not sustained. The determination in this respect will answer and dispose of all of the contentions, both with respect to the admission of testimony and instructions to the jury. It has heretofore been determined that the contract is sufficiently open to the construction placed upon it by plaintiffs to enable plaintiffs to offer parol evidence in support of this interpretation. If successful, the plaintiffs will prove that the contract imposed upon the defendant the obligation to market plaintiffs' milk upon the Chicago fluid-milk market, together with and upon the same basis as that of other members. The breach being the failure to do so, the damages will be the difference between the prices plaintiffs received and the price they would have received had the contract been carried out according to its terms. The burden is upon the plaintiffs to prove both the fact and the amount of the loss. *Spielberg v. Harris,* 202 Wis. 591, 232 N. W. 547. *Prima facie,* however, this proof is made by showing the price actually received by members of the association during the period when plaintiffs were off the market. Plaintiffs having made such a *prima facie* showing, we think it was open to defendant to show, if it could, that the price would have been affected unfavorably by the attempt to market plaintiffs' milk with the rest of the milk of the association. The contract was not for sale at a specified price. On plaintiffs' theory, it called for disposition of all of the association's milk upon the Chicago fluid-milk market, and defendant should be allowed, if it can do so, to show what price would have obtained had the contract been carried out according to its terms.

Defendant objects to the admission of certain tabulations in evidence for the purpose of proving plaintiffs' damages. The tabulations showed the monthly base of each of the claimants, the pounds of milk actually produced, the test of the milk, the amount of milk in each class, the amount for which the milk was sold after the breach, and the amount for which it would have been disposed of at Chicago fluid-milk prices during the same period. The difference between the last two items constituted the loss claimed by reason of the breach. Such tabulations are not objectionable so long as they constitute mere computations or summaries based upon the evidence. We have been unable to discover any reason for holding that these tabulations are not supported by the record, nor do we think that the tabulations are inadmissible as presenting to the jury a basis for damages that is erroneous as a matter of law. The propriety of the measure of damages as indicated by the tabulations depends upon the success of plaintiffs in making out their case with respect to the interpretation of the contract. But, assuming this success, the tabulations are not open to objection.

The errors assigned in this case are numerous, but, so far as we have been able to determine, they will all be disposed of by an application of the principles set forth in this opinion, and a consideration of each item of evidence or instruction, the propriety of which has come into question in this case, would serve merely to unduly extend this opinion.

For the foregoing reasons it is considered that the judgments must be reversed.

*By the Court.*—Judgments reversed, and causes remanded with directions to grant new trials.

OWEN, J. (*dissenting*). I think the judgments in these cases should be affirmed. I fail to appreciate the ambiguity which it is claimed justified the reception of the rejected evidence. The pleadings in the cases disclose that the defend-

ant is a co-operative association organized under the laws of the state of Illinois; that it is organized for the purpose of handling co-operatively and collectively the milk products of its members without any pecuniary profit whatever; that it was instituted for the mutual help and benefit of its members and to promote their general welfare in their business dealings in the Chicago fluid-milk district. From the evidence legitimately in the case it appears that any one who signs the contracts similar to the contracts involved in these actions becomes a member in the defendant co-operative association, and that the purpose of this co-operative enterprise was to bring to the single control of the defendant for marketing purposes all of the milk produced by its members. It appears indisputably that the form of the contract which is the subject of these cases was to bring the members into a co-operative enterprise with the purpose of controlling so far as possible the natural milk supply of the city of Chicago.

Uniformity of treatment of its members is an inherent element of every co-operative concept. When it appears, as it plainly does by the pleadings in these cases, that co-operation in the marketing of milk products was the purpose to be attained by this enterprise, I can see no ambiguity in this contract. The contract which constituted the defendant the agent of all its members to market their product provided a very simple and efficient method for bringing their product under a single control, and thus constituted a pooling of the products of the members. The accomplishment of the enterprise required that the volume of milk produced by the participants in the enterprise should be marketed as a unit, and the proceeds arising from the marketing of this unit should be distributed *pro rata* among the members of the association. This dominant thought cannot be ignored when it comes to a construction of the contract signed by all those participating in the enterprise.

When, therefore, the contract provides that the milk of the individual member shall be marketed, "together with milk delivered by other members signing similar agreements, . . . in such a way as it shall deem best for the advantage of all persons signing similar agreements," there can be no doubt of the duty imposed upon and assumed by the defendant co-operative association. Each and every member is to be accorded the same treatment that is accorded to each and every other member, and each member is entitled to his *pro rata* share of the proceeds arising from the marketing of the combined products of the members treated as a unit.

This right of the individual member and the duty devolving upon the defendant is wholly inconsistent with the right of the defendant to kick out a portion of its members in order that the remaining members may enjoy topmost prices. The obligation of the defendant is to accord to each and all of its members uniformity of treatment. If it has a volume of milk greater than can be absorbed by its market for fluid-milk purposes, it must make some other disposition of a portion of the volume, but the proceeds of the sale of the entire volume must be apportioned ratably among the members. For these reasons, the general principles relating to the duties which the principal owes his agent do not apply. Those duties have been modified by express contract.

For these reasons, rather briefly and cursorily stated, I must dissent from the conclusion reached in the majority opinion.

I am authorized to state that Mr. Justice FRITZ and Mr. Justice FAIRCHILD concur in these views.

The following opinion was filed May 10, 1932:

PER CURIAM (*on motion for rehearing*). It is earnestly contended by the respondents that the decision heretofore

filed fails to give proper weight to the fact that the contract, upon its face, is clearly disclosed to be co-operative in character and that the decision opens the way to discrimination by the association against some of its members by putting them off the market for the benefit of other members.

In the interest of clarity, and in view of the fact that a new trial is made necessary by the decision, a further statement of the court's view is considered to be advisable.

An examination of authorities on the subject of co-operative marketing indicates that co-operatives may take an almost infinite variety of forms, and that there is a type of co-operative existing mostly with respect to the business of selling milk which is of the same character that defendant contends this association to be. While such co-operative has obvious disadvantages in operation, and while it offers to its members less services than more ambitious undertakings in this direction, it nevertheless has the advantage that it can operate with smaller capital and a smaller charge to the members than the pooling type of co-operative. It offers to its members ordinarily the means of inspecting and standardizing their product, as well as stabilizing the price by the control of the market. Such an association necessarily operates by contracting with dealers who have handling facilities for milk. It acts, therefore, as a marketing agent with the usual duties and responsibilities of such an agent.

It was held in the opinion in this case that the language of the contract will accommodate itself to the meaning contended for by the defendant association, namely, that the co-operative was a co-operative of this sort. It does not follow, if the extrinsic evidence should establish this as the sense in which the language should be taken, that the association can deliberately or intentionally eliminate from the market a portion of the producers who are members in order that the remaining members may enjoy more favorable prices.

The contract is not open to such a construction. Even though the sense or meaning contended for should be established, the association is obligated to exercise the same diligence and good faith to market the milk of one member that it exercises to market the milk of the other members. This is the co-operative principle as applied to this type of organization. It is violated when and if the association discriminates in the exercise of its sales efforts between members or groups of members, each of whom has an equal right to the exercise of these efforts. It is not violated if the association has exercised reasonable diligence in good faith and without discrimination. Any other rule would result in the immediate destruction of this form of co-operative, which is designed to give to producers of milk some of the advantages of co-operative action without the capital and expense incident to more ambitious undertakings.

A careful reconsideration of the other matters raised in the motion for rehearing convinces the court that it should adhere to the determination originally made.

Motion for rehearing denied, with $25 costs.